Illinois Appellate Court, State of Division, is now in session. Honorable Judge Keith got the bill. Good night. Good morning, and please be seated. Madam Clerk, will you please call the first case? 15-1172, National Private Client Group, Inc. v. Fatwallet. Okay, I'd like the attorneys to step up to the podium. I'd like for you to tell the court your name, who you represent, and approximately how long your argument will take. Step up to the podium. Good morning, counsel. Why don't we hear from the appellant first. Good morning, Your Honor. John Gowarnik on behalf of the petitioners, National Private Client Group, and Julianne Hepburn. Okay. How long will your argument take? I believe 15 minutes, Your Honor. Okay, very good. Is there someone with you? Oh, yes. Good morning, Your Honors. Andrew Cuniff, also on behalf of the petitioners, National Private Client Group, and Julianne Hepburn. Good morning, counsel. Okay, for the appellee. Good morning. Margo Wolfe O'Donnell on behalf of the appellee, Fatwallet. Okay. Good morning, counsel. And good morning, Your Honors. Josh Orweiler, also on behalf of the appellee, Fatwallet. Good morning. Okay, why don't the appellee's attorneys have a seat, and we'll let the appellants proceed with their argument. Good morning. May it please the Court, my name is John Gowarnik, and I, along with Andrew Cuniff, represent the petitioners, National Private Client Group, or as we may refer to them from time to time throughout the argument, NPCG, and its president, Julianne Hepburn. Ms. Hepburn is here with us in court today. Justices Neville, Hyman, and Simon, the case before us today involves the application of a traditional tort, a tortious interference with prospective economic advantage, to a new problem. The intentional destruction of a business through search engine manipulation, or as we will refer to it today, Google bombing. The petitioners respectfully request that this honorable court reverse the decision of the trial court which dismissed the amended complaint for tortious interference with prospective economic advantage for two stated reasons. First, that the petitioners plead sufficient facts to state a claim for tortious interference with prospective economic advantage. Second, the public policy against the intentional destruction of business opportunities supports the application of this tort to the interference to address a new harm that's peculiar to this new area, the internet era. As you are aware, we're appealing from Judge McPherson's dismissal with prejudice pursuant to Section 2-615 of National Private Client Group's and Julianne's amended complaint. Are you objecting to the use of 2-615 at all as a basis for determining whether you've made a claim that would be viable for a 2-2-4 disclosure? Well, I think that Judge Mitva at the lower court conflated the pleadings requirements of 2-615 with proofs as required once we get past the pleadings. So I think that the issue of what's required of us at 2-615 is relevant. There are 2-24 cases that discuss the obligation of a pleader to plead the facts sufficient to support the causes of action, but it's not a proof issue at the 2-24 stage. They're a gatekeeper for some reasons, which are important, but we believe that the first complaint, as well as the amended complaint, clearly satisfied the pleading requirements. But the first complaint's not before. It is not. In order to plead a cause of action for tortious interference, the plaintiff must plead facts sufficient to establish a reasonable expectation of entering into a valid business relationship, the defendant's knowledge of the plaintiff's expectancy, the purposeful interference by the defendant with that expectancy that prevented the establishment of a viable business with valid business objectives, and damages to the plaintiff resulting from the interference. And that's under the case of Dowd and Dowd v. Gleason. Is defamation a necessary element in this case? It is not. It's not a necessary element in the pleading requirements under Dowd and Dowd v. Gleason. It's not a necessary element of the tort under which we're proceeding. So it's not a predicate for proving tortious interference? It is not. There's a possibility that that wallet could assert some sort of privilege, but we believe no privilege would apply here. Even if a privilege did apply, they can't get past the fact that the conduct of the trolls was intentional, malice. It was intended to destroy MPCG's business. So even if there were a privilege, which there is not, it wouldn't apply here. So with regard to a reasonable expectation of entering into a valid business relationship, what facts have you pled? The reasonable expectation is based upon this peculiar new business model that exists on the Internet. What MPCG and Julianne Hepburn did is they constructed a specific business model dealing with the monetization of life insurance policies, the value that's built up in a whole life insurance policy. They created a business. They designed a website. They built the website out, and they operated and managed the website to the point where then they So what facts are in your petition? But they built it out. Where is that? It's described in paragraph 30 and 31 of the complaint as the electronic footprint. Okay, so first of all, I don't know what an electronic footprint is. You have it in capital E, capital F. So why is it capitalized? Is it some kind of reference or something? I don't know. It's a defined term for the purposes of the pleading. So every time we talk about the electronic footprint, we don't have to describe the website and the other click-through, pass-through structures they set up in order to attract and then deal with their customers. Okay. And you define an electronic footprint as anything that maintains a considerable online presence, constitutes a significant portion of their marketing efforts designed to attract and obtain new clients. Isn't everybody on the internet trying to do that who has a business? I still don't understand what an electronic footprint is. I mean, that's just presence on the internet? Well, it's a presence on the internet for this particular business to attract new business. Well, there are different kinds of businesses. There's a business that wants to sell something. Pardon me? Any business wants to sell something, right? Well, some of the internet businesses just want to inform. I'm saying marketing. So any business that wants to market, they have a presence on the internet. I mean, I don't understand how that is anything special. Here's how it's special, and perhaps the pleading is broad, but what the electronic footprint for a national private client group was intended to do was interact with those specific people in the population who were in the market for financial services, including the leveraging of whole life insurance policies. How would you know if they're doing that or not from just being on the internet? How would you know somebody's in the market? Well, the way the electronic footprint works is that when you, and for the purposes of MPCG's clients, the searching for whole life insurance products like this or personal banking products like what's being sold by MPCG and attached to MPCG and Julianne will bring you to their electronic footprint. Well, if I put in, I don't know about MPCG, I don't know about Ms. Hepburn, so how do you know that I'm looking for you? Well, we know you're looking for us when you're in our electronic footprint. Once I get to your site. Once you get to our site. Once I get to your site. Correct. We're not talking about if I got to your site, how do you know that I saw a fat wallet? The discussion from January 3rd to January 7th or 8th? Well, there's two parts of it. We know that our customers are in our footprint because they click through to interactive items within our footprint. They click through to an electronic newsletter. They participate in blogs. At that point in time, once they come in and interact with us at that level, those are the clients that we're trying to protect in this litigation. Once they touch us, then we know who they are and we can attract them. When do they touch you? When they touch us. What's the so-called class? Anybody ever touch you? It's not anyone who just comes in and searches our site. That's not our class. Our class is when they come in and search in our site and interact with our electronic footprint. When they click through to our newsletter. When they click through to our blogs and they participate in conversations with us. Once they do that, once that group participates with us, we convert those targets to sales at the rate of approximately 90%. Once they get there, they have diluted. They've been distilled down to such a fine level that we have a client group that's extraordinarily rich in conversion to actual sales. The only person you identify in your complaint is Mr. Hutner, correct? We did identify one member of the class. Were you aware of other members but you didn't identify them? We are aware of other members. As a matter of fact, in the review of the thread on the fat wallet forum, the trolls referenced another woman whose policy was being looked at. They called her a gullible mark. They've identified her. We identify Mr. Hutner because he was so far along in the process. As your honors are probably aware, when you apply for whole life insurance policy, it's extraordinarily interactive. You're providing your blood. You're providing access to all of your medical records. You provide other samples to the extent that the insurance company needs to determine that you're healthy enough for them to consider taking the risk on your life. But Mr. Hutner is the only person who went through this process where he was letting his blood. Well, he's representative of the class who was our client who came to us through our electronic footprint, who interacted with us. We identified him, and we were steps away from the sale at the time of the January 3 fat wallet posts. I mean, what you just said and what you have in paragraph 33 is not the same. First of all, it's on information and belief, so you don't have any knowledge. Here's what we know. And for those of us who have applied for life insurance, and I did so recently, they come in, they take your blood, they take your urine, they request all your medical records. But you didn't put any of that down here. This is a conclusion. As a client, he may have been an old client. You're saying this is only for new clients. We don't know if he's a new client or a former client or has been a client before. You just said he's a client. I'm just saying the words that you put out. I see where the court's looking. And what we assume from the use of the terms underwriting process that there's an understanding of what the underwriting process is. It's a common process that anyone who applies for life insurance knows about. Maybe it could have been expanded upon that they sent him to his medicals, that they obtained his health insurance records. But people who are applying for life insurance, once they get to that point, they're purchasing. No one's just going to give the... But you don't even know if he... We don't know, looking at your... There's no fact to say he even passed the underwriting process, that you were helping him through it. That he ultimately didn't... He may have looked before and may not, but we don't even know that. It's some information belief. But there's nothing to say that he even could have been a client. Well, he definitely could have been a client because he's already interacting with us and purchasing. But he may not pass the underwriting. If he... You haven't said he passed the underwriting. So if somebody goes in and doesn't pass the underwriting, they're still a member of this class. Does that... Well, if the person shows up at that point in time in 2012, I believe there's still the... I believe that they were still able to get insurance, life insurance regardless. It might have cost them more, but we don't know if he would have purchased. But he was at that point in the underwriting process where he steps away from... But we don't know this. I'm just saying, what facts do we... All the facts we know are in paragraph 33. That's the only thing we know. And what does that tell us about this particular individual? Well, and then you said at that time. What time are we talking about? There's no... Your class is... When? Is there any time period on this? Well, the class is interfered with by the Coasters. I'm studying January 3 and running to about January 6. But that doesn't say that anywhere here. But it's in the attachment. We were lucky enough to be able to attach the entire thread of patrols, and that defines the time period when they're conducting the interference. So... But where does it say the class is only between those dates? Well, are those the people who went on your footprint during those dates or people who were helped through the process during those dates? I'm not quite clear. The purpose of and the insidiousness of the actions of these trolls is once they put this on the Internet, once they're able to Google bomb so effectively where the scam is inextricably attached to national private client group, that goes on forever. We've made extraordinary efforts trying to reduce that off of the first page of the search engines. We've not been able to do that. Once the Google bombers are successful in Google bombing, once those trolls are successful in achieving what they set out to achieve on January 3, 2013, it runs on to our business and affects our business for as long as the Google bomb remains effective on keeping a scam attached to national private client group on such a prominent level on the search engines that every client who comes to look at us will see that. So... But what we're talking about... Are those dates then... No, no, what we're talking about to define people, what we did with Mr. Hartnett is we showed that there is a representative, an identified, identifiable member of that class who we already know. Whether everything about who he is involved in that underwriting process is something that will entitle us to prevail on the merits at trial is one thing. For the purposes of pleading, we've identified a class that's identifiable not only because we have identified it specifically in the complaint, but the trolls identified that target market. The trolls specifically set out on the very first page of their thread in the forum that they're going to attack national private client group and people who are trying to purchase these products on the internet when they search for it. What's it doing? They're trying to purchase, which is the words you just used, a prospect. So they may not want to purchase a prospect. I may walk into a store, look around and say, I'm not interested. Does that make me part of the class? It doesn't. It does not make you part of the class. If you come in and you don't have your window shopping and say I look at your newsletter or your whatever, you said 90%. Is the class the 90%? Or is it 100% of the people? Again, I'm trying to clarify what you mean because class has to be specified. And the cases I think are distinguishable for the reasons that the appellee may have stated with regard to the federal cases that have talked about class. The Yukon and the Cook case. The Knapp versus McCoy case, the radio station case, is very similar to our case where the... Well, that was the media case, right? It was the media case. But that is different because he's looking for a job and there are only certain outlets. I mean, this is... You're saying it's anybody who steps into this site. Well, Your Honor, by the time you get to this site, we're not looking... We're not set up to sell a whole life... But if you get to the site, apparently that Fed wallet didn't do much for you. But if you get to the site, how do you know the Fed wallet had anything to do with it? The trolls had anything to do with your... Well, how do we know that the trolls did what they were supposed to do? No, no, that it had any effect. That it had any effect. Well, we know it had an effect because Mr. Hutner was about ready to purchase and then at the time consisted with the purchase. He left us. He broke off communication. But he was the only one that saved you because if he had gone, it would have been the end. But instead, now you do... So the question is, the potential customers that were expected to be absorbed through this. So, is there... What is the... What is the ability to prove an expectation of business? That was the metric, wasn't it? Well, the expectation of business is... We established our model and we run our model to such a point in time that by the time they got to us, they weren't looking to purchase life insurance, term insurance, health insurance or anything like that. When they got to us, looking for us, as contained in the definition, it's not just for everybody. It's when they come in looking for our product from us on our website. It's a defined, limited amount of people. It's definable because they come in and interact with us and once they interact with us, we know who they are and then we make contact with them and then we convert them at the rate of 90%. If they're just browsing for insurance, they could go into some other website, insurance.com, lifeinsurance.com, and they can go and they can shop for insurance and they don't have to interact. We interact with our customers, with our group, like Mr. Hutner. The example of someone who is identified and then we convert them at that rate of 90%. It was an effective business model for us that dried up immediately when these posts hit. We know that they dried up because we saw the effect in our business. But that's not alleged anywhere in your petition? 90% that it dried up or whatever the percentage was afterwards? We did not allege 90% but again, I think that that's the difference between the pleading requirements and the proofs. If we plead 90%, that doesn't add anything more to the fact that we satisfied the pleading obligation of stating that the interference caused an immediate drop in our business. The pleading sets forth that Mr. Hutner was a client who disappeared when the, I'm sorry, prospective client was there and disappeared as soon as he saw the posts. The pleadings are sufficient. The proof of those issues is where we think that Judge Mitvall got tripped up on at the trial level. Let me ask you a different question. You filed a verified amended petition, is that correct? That's correct. And it must be verified, is that correct? That's correct. And the Supreme Court Rule 224 sets out that it must be a verified petition. That's correct. And you attached the verification to your petition in the record to CO88? Correct. Okay. What is a verified petition? A verified petition is a pleading that's verified by the plaintiff as the allegations contained within it are true. Okay, and in order to be a verification, are there certain requirements necessary to cause a piece of paper to be delineated a verification under the analog rules? Yes, there's a requirement of personal knowledge. Anything else? Does it have to be notarized? I don't, I'm not sure if that does. Well, how can, if it's not, if a verification under Rule 1009, you don't have to have it verified, right? Did you have a petition under 1-109, your verification? I don't recall if we did have a verification obligation, I mean a notarization of the verification obligation under Rule 1009. Let me show you what's attached. Yes. It says it's under oath. Where's the notary? Is this notarized? It does not appear so. Okay. So, verification can be through 1-109, it's got to be under oath, otherwise it's meaningless. I mean, somebody could just say your initial verification was notarized and this one says that she was sworn on oath to opposing states, yet there's no notary. Is this an appropriate verification? If it is, why? No, I can hand it to you if you want. No, I have it. What I was doing is I was comparing the verification on the first complaint with the verification on the second. The difference is there's no notary. I don't know the answer to that, Your Honor. Okay. Getting back to the issue of identifiability of the class, when the anonymous posters started their forum, they began and introduced the forum as NationalPrivate.com, another scam company for FWF to bust. There's no doubt from the words that it was used by the trolls that they intended to go in and bust National Private Client Group's business. The group, as we discussed earlier, that National Private Client Group is trying to protect is defined in the amended complaint as new clients, those who purchase personalized wealth management plans, including the leveraging of whole life insurance policies through the electronic footprint when those potential clients searched for NPCG or Julianne online, thereby contemplating entering into a business relationship with NPCG and Julianne. At the trial level, the court got bogged down in the first phrase, new clients, and we think that that's not an accurate recitation of what's in the pleadings. As set forth in both Crinkley v. Dow Jones, where the identifiability of the... I still don't understand paragraph 32. You reasonably expect to obtain new clients. Then you say those who purchase personalized wealth management plans and then you narrow it, but that's a pretty large group, who purchase personalized wealth management plans through the electronic footprint, who purchase through the electronic... So only those who you expected to purchase... How would you expect them to... I mean, how would the trolls know anybody was in that class? The trolls identified the class. The trolls actually made the proof that the class is identifiable obvious. They set out to interfere, as they said on the first page, thought it would be a good start to start for the search engines for anyone searching for this company. The trolls identified it. They know who it is. They know who the company is. They know who the company is. They don't know anything about Mercury. I don't see Mercury wasn't even mentioned in any of those. The Mercury file is the second group. The first one's our customers. Let's hit the class. We haven't talked about Mercury. The Mercury file is different. Mercury file is something that you would have found when they searched for Julianne, which they did, which we know they did. Who's they? The trolls. So whether they did or didn't Julianne, you don't know that. We do know that, absolutely. Because if you look at the... Where's Mercury file mentioned? Anywhere in the... That's the peculiar thing about the Internet. When you search for Julianne Hepburn on a search engine, there'll be a first page that comes up. And in January of 2013, on the first page prominently was Mercury file. We know that they searched Julianne because of the references they made to her personal information that they wouldn't have found anywhere except for on the Internet. We know that the Internet doesn't mean they... Again, there's no mention in any of the references by what you call trolls of Mercury... Right? File. Nothing. There's no reference... Was the CEO in honor of Mercury? Yes. There's no reference specifically in the thread, in the forum, of Mercury file. But when they searched Julianne in January of 2013, they absolutely had to know of Mercury file because Mercury file was prominent on the first page of Julianne. Further down on Julianne's page, the first page in the search engine, were references to an interview that she had given at one point in time regarding Botox. And the Botox references contained within the thread further on down. But you don't make any of those allegations in your petition. Well, we attach the... We attach the thread. So? Well, the thread shows exactly what the trolls are doing, how they're doing it, why they're doing it. But that is an attachment. I'm talking about what you've pled. But the attachments to the complaint are part of the pleadings. And our obligation is to plead facts, is not to plead conclusions. If we show the facts, then there's the... Well, isn't it a conclusion the members knew or had reason to know? How is that not a conclusion? The members knew and had reason to know. And if we look at the thread attached to the complaint, we show that they knew. Well, there's no... You don't say anything about a thread. If we look at the thread or where in the thread we would make this... To me, that's a conclusion. Okay. Now you're saying, in order to... The facts for that conclusion come from the thread, which is not referenced there. A clear intent of the post... I mean, it's not so clear what their intent is. I mean, I think that's... If it was so clear, why did they have reason... You say reason to know? Is it... Where in the law does it say reason to know is enough? Is there any case that says reason to know? If somebody had reason to know rather than a new... Well, there's a number of pleading cases that talk about the natural extension, the logical extension, of facts being pled. This is certainly nothing unusual for pleading and pointing to the documents that support the facts of what would otherwise be a potentially illegal conclusion. What we do is we reference the exchanges by the Internet trolls that state from the first page that the purpose of this form is to bust National Private Client Group, to connect to Googlebomb, to set up accounts online for this fine, upstanding company so that they can continue to interfere with the business. One of the posters on January 4th writes, Just doing my part to Googlebomb, and then attaching a number of otherwise independent words, scam, jerk, fraud, allegation, scam, illegitimate, questioning legitimacy, might be... You don't have to read it, I'm afraid. The prominence that they were trying to cause for the search engines was to affect National Private in its three iterations searching for that company on the Internet. They know what they're doing. They're using the term Googlebomb. The purpose of the type of thread, they actually state that. They actually write the purpose of these types of threads. They specifically target, purposefully target, we know that that's what they're doing because that's what they say they're doing. Then they follow whether or not their efforts to Googlebomb National Private was successful. And they track that at one point in time, if you search nationalprivate.com, it was result number 16. They're much happier with nationalprivate.com thread. I'm sorry, nationalprivate, just without the .com, was number 16. Nationalprivate.com, the thread pulled up as a number two on the search engines. For National Private, the thread was buried at that point in time and they continued to conduct their efforts to attach those words to National Private. There was no other reason to do that but to destroy National Private's business. Mr. Gowarnik, why don't you bring your argument to a conclusion and I'll give you a few minutes in rebuttal. In the end, what the trolls did was successful. They succeeded with great efficacy in driving away the potential customers including Mr. Hutner. They crashed National Private's business. The goal that Sucka Staples S-U-C-K-I-S-T-A-P-L-E-S identified when he created the forum. For these reasons, we respectfully request that this honorable court reverse the trial court's dismissal with prejudice and the 220 court  the trolls. In the alternative, that the court reverse the trial court's dismissal with prejudice and remove the trolls with authorization to reclaim. Thank you. Thank you. Ms. O'Donnell. May it please the court, Margo Wolfe O'Donnell on behalf of Appalachia Fat Wallet.       It was intended to be a procedural procedure that was intended to be a procedural procedure that was intended to be a procedural procedure that was being being conducted and being conducted in  manner  it was in a manner that was being conducted in a manner that was intended to be a procedural way          to be a procedural way of being conducted in a that  intended to be a a manner that was          in a manner